## Ogram *v.* Ogram, Appellant.

Argued October 13, 1947. Before RHODES, P. J., HIRT, DITHRICH, ROSS, ARNOLD and FINE, JJ. (RENO, J., absent).

*Edward Paul Smith,* with him *Charles T. Bonos, Jr.,* for appellant.

*Reuben Levi,* with him *Joseph L. Fox,* for appellee.

OPINION BY FINE, J., March 8, 1948:

Appellee filed his libel in divorce charging his wife, in the language of the statute, with wilful and malicious desertion beginning April 12, 1943. Appellant's exceptions to the master's report, recommending a divorce on the grounds alleged, were dismissed by the court below, a final decree in divorce was entered and the wife has now appealed.

The pivotal question is whether the appellant has shown the separation was consented to by libellant. The defense of consentable separation to the charge of desertion is an affirmative one and the burden is on the respondent to establish such defense by satisfactory evidence. *Hagen v. Hagen,* 159 Pa. Superior Ct. 539, 49 A. 2d 193; *Westfall v. Westfall,* 148 Pa. Superior Ct. 477, 25 A. 2d 614; *Goldman v. Goldman,* 156 Pa. Superior Ct. 413, 40 A. 2d 878. We conclude that the respondent has failed to meet the burden cast upon her of affirmatively showing a consentable separation.

The parties were married on November 19, 1921, and after their marriage lived at 5345 Greenway Avenue, Philadelphia, where they continued to reside until the separation which occurred on April 12, 1943. At the time of hearing, the libellant was 56 years of age, was employed as a watchman and respondent was 50 years of age and employed as a waitress in a mid-city restaurant. The undisputed fact is that on April 12, 1943, he went to his work at about 2:30 p.m., as was his custom, and upon his return home from work at 1:00 a.m. the next morning found that his wife had gone; that she had removed furniture, rugs, dishes, pots and miscellaneous things of value and had left libellant some old furniture and a bed; that she has not since returned to cohabit with appellee nor has she offered to return. Respondent gave no indication of her intention to leave and her departure came as a complete surprise to libellant. He testified that the day prior to her leaving the parties had a quarrel following a telephone call made by their son, Herbert, who at the time was in Connecticut in the military service. Respondent answered the telephone and when she returned the libellant asked her, "What did Herbert say?" She replied, "The hell with you, I'm not going to tell you what he said." Libellant testified that this precipitated a quarrel between them; respondent's testimony corroborates the libellant's to

that extent. The husband's query evincing, as it did, love, affection and concern for their son, was in direct contrast to the respondent's answer, which was wholly uncalled for, emphasized her mean, wicked and contemptible attitude on that occasion and revealed a belligerent disposition, bad manners and a hardness of heart. Her irritable retort quite naturally provoked a response which was not unreasonably disproportionate to the provocation nor excessively retaliatory. We may add that we have discarded considerable of the respondent's testimony of what transpired at that point, as wholly untrustworthy and incredible. That the respondent's leaving was without libellant's consent and against his wishes is persuasively shown by the fact that the day after respondent left, libellant called her on the telephone at a drugstore in the vicinity of her mother's home; he asked her why she had left and if she were coming back; that she told him "I'm tired of you. I don't want to bother with you. I've stayed with you until the child was able to take care of himself. You are six years older than I am, and I don't want to be bothered with you." Moreover, a day or two thereafter he tried again to communicate with her on the telephone but when she heard his voice she told him to "Go to hell" and hung up the receiver.

A desertion without consent and without sufficient legal cause is presumed to be wilful and malicious. In *Hedderson v. Hedderson*, 35 Pa. Superior Ct. 629, 631, we said:—"it is not necessary to prove actual malice; indeed the cases are rare in which this can be done. If the desertion is intentional, it is willful. If willful, malicious." *Ingersoll v. Ingersoll*, 49 Pa. 249, 251. Cf. Freedman, Marriage & Divorce, §224, p. 566. That the desertion of appellant was wilful and malicious is abundantly clear.

The crux of appellant's case, and upon which she now relies to show a separation consented to by appellee, is her testimony and that of her witnesses to the effect

that on many occasions over a long period of time appellee urged her to leave the marital domicile. We agree that the master and the court below properly evaluated respondent's attitude when they observed that she paid no attention to such statements and considered them absolutely meaningless since she continued to live with appellee from November 19, 1921, until April 12, 1943. The following testimony typifies her attitude: "Q. When you said that when your husband said that he was going to throw you out *you said you dared him to do it.* In other words, you were afraid of him, were you? A. No. Wouldn't you stand up and ————."

After appellant left her home she admitted that thereafter she never attempted to return and live with her husband nor did she return to visit in the neighborhood. Nor did appellant leave a note to inform appellee or their son where she had moved. At one point she testified: "Q. Now, did you tell your husband on the day that you left that you intended to leave? A. I told my husband nothing. . . . Q. And when you left he was at work, isn't that so? A. Yes."

On direct examination she testified: "Q. And he never asked you to come back to him? A. No sir. I met him once on the trolley car after I had left him. I met him once on the trolley car. I was as close to him as we are. He never looked at me and I never looked at him. I made no attempts to go to him and he made no attempts to come to me." This testimony further reveals the state of the appellant's mind and her unbending determination not to have anything to do with the appellee or to return to him.

A complete chronological sequence of the marital disputes of the parties in their 23 years of married life reveals that from the beginning the temperament of the parties clashed over practically everything in the household. In light of such evidence, much of which we have omitted, it is obvious that the recommendation of the master and the decree of the court below were en-

tirely right and just. In fact, any different result would constitute an unwarranted disregard of the credible evidence. We have not discussed the respondent's assertion that indignities offered her were such as would entitle her to a divorce, as her counsel stated at oral argument he was relying on a showing of a "consentable separation" as a bar to a decree in divorce. Albeit, there were no such indignities shown which rise to such legal significance. It may be said these parties possessed blunted, not normal, sensibilities. If both are to be believed each had a ready and easy tongue for base and uncomplimentary remarks and a facility of abusive expression. Insulting, degrading and abusive remarks were frequently addressed by each to the other, but it seems that such remarks lost by their frequent repetition, their barbed incisiveness,—hate, ridicule and contempt. Illustratively: "Q. Didn't you argue with your husband? A. Certainly, when he argued with me, I gave it back to him. Q. And you called him names? A. He called me names first and I called it back to him. Q. Now, what did you call him? A. He called me a 'S-B.' Q. What did you call him? A. I said, if I am an 'S-B,' you are two of them. Q. You called him twice? A. If I am a son-of-a-b. Q. What else did you call him besides son-of-a-bitch? A. Everything he called me. Q. You tell me? A. He called me a bastard, and I called him a bastard. Q. You called him a bastard? A. He called me one, and I said double that for you. Q. You called him a bastard twice then? A. Yes. Q. And what else? A. That is all I recall. Q. Son-of-a-bitch and bastard? A. If he called it to me, I doubled it to him."

The respondent does not appear to have reacted to these quarrels as one humiliated or as one who suffered indignities; on the contrary, she seemed proud of her ability in these "give and take" affairs and indeed instigated some of them.

Although the libellant's testimony bearing on the material aspects of the case stands alone and has been

contradicted by the respondent and her witnesses in some minor and immaterial matters there are many convincing circumstances which discredit her testimony and leaves libellant's evidence in the main unshaken. We feel the quality of the libellant's evidence far surpassed the respondent's evidence and conclude therefore that the court below did not err in concluding the libellant has shown, by competent evidence, corroborated in many respects by the respondent's own testimony and the testimony of her witnesses, that her leaving was wilful and malicious and that appellant has failed to sustain her burden of proving a consentable separation.

Decree affirmed.